**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Luke Sironski-White (State Bar No. 348441)
Ryan B. Martin (State Bar No. 359876)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ndeckant@bursor.com
          lsironski@bursor.com
          rmartin@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOUIS CUNEO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NUMBZ LLC<br><br>Defendant. | Case No.   2:25-cv-11013<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff Louis Cuneo ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Numbz LLC ("Defendant").  Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a civil class action lawsuit against Defendant for false, misleading, deceptive, and negligent sales practices regarding its 7-Hydroxymitragynine ("7-OH")[1] (the "Products").

2.      7-OH is an alkaloid (psychoactive chemical) found in the kratom plant (*mitragyna speciosa*).  The plant originates from Southeast Asia where its leaves have long been ingested to produce stimulant and opiate-like effects.  Use of kratom in the United States was practically non-existent until the last decade.  Since then, kratom has become a massively popular substance.  This is because it is currently legal to consume, and because of the stimulant and opiate-like effects produced by its two major alkaloids: 7-OH and mitragynine.

3.      However, what consumers do not know is that the opiate-like effects produced by mitragynine and 7-OH are not the result of novel chemical interactions in the brain.  Rather, these alkaloids behave, in part, exactly like opioids.  That is, the mitragynine and 7-OH alkaloids found in the kratom plant bind to the same opioid receptors in the human brain as morphine, heroin, and other opiates/opioids.[2]  Consequently, kratom consumption has the same risks of addiction, dependency, and painful withdrawal symptoms, among various other negative side effects as traditional opioids.

---

[1] The Products include all of Defendant's 7-Hydroxymitragynine and 7-Hydroxymitragynine + MIT chewable tablets (50 mg, 100 mg, 300 mg, and 500 mg).

[2] An opiate is a substance derived from opium whereas an opioid is any substance that binds with the mu-opioid receptor.

4.      But it gets worse. While both active alkaloids in kratom interact with the opioid receptors, 7-OH is substantially more potent than mitragynine. Indeed, some studies have shown that 7-OH is ten times more potent than morphine in activating the mu-opioid receptor, which is the receptor associated most strongly with opioid addiction.

5.      When reasonable consumers think of opiates and opioids, they think of heroin, fentanyl, hydrocodone, oxycodone, and morphine; they do not expect that the "all natural" product bought at their local corner store operates like an opioid, with similar addiction and dependency risks. Kratom is perniciously addictive—on a whole different level than caffeine—and it has sunk its hooks into tens of thousands of unsuspecting consumers and caused them serious physical, psychological, and financial harm. Defendant intentionally and negligently failed to conspicuously disclose these material facts on its labeling, packaging, or marketing materials, and has violated warranty law and state consumer protection statutes in the process.

6.      Defendant relies on its Products' innocuous packaging and the public's limited knowledge about kratom and its pharmacology to get users addicted, while reaping profits along the way. Reasonable consumers do not expect the tablets, which they can purchase at gas stations and corner stores, to perform like an opioid with the same addictive potential of morphine and its analogs. Defendant relies on this ignorance and does nothing to correct it. Such activity is outrageous and is in contravention of both law and public policy.

7.      Defendant has engaged in a systemic effort to peddle an addictive substance to unsuspecting and oftentimes vulnerable consumers. Plaintiff seeks relief in this action individually, and as a class action on behalf of similarly situated purchasers of Defendant's Products, for: (i) violation of Texas's Deceptive Trade Practices Act, Tex. Bus. & Com. Code § 17.41, et seq.; (ii) unjust enrichment; and (iii) fraud by omission.

**PARTIES**

8.      Plaintiff Louis Cuneo is a citizen and resident of Georgetown, Texas. He is a repeat purchaser of the Products.  He first purchased the Numbz 7-OH Kratom Tablets (15 mg tablets, 300 mg bottle) on or around May 2025 at a CBD store in Georgetown, Texas.  Plaintiff Cuneo did not believe the Products to be harmful and was not aware that the Products carried a potential risk of being addictive.  Plaintiff Cuneo reviewed the Products' packaging before making his purchase but did not see any warning regarding 7-OH's addictive qualities.  Indeed, the disclosure text on the packaging was so small that neither he nor any reasonable consumer could read it.  Plaintiff Cuneo began by using daily tablets because he had no reason to believe the tablets were habit-forming or that he was developing physical dependence on them.  A few months later, Plaintiff Cuneo realized he was addicted when one day he tried to stop taking the Products and experienced withdrawal symptoms, including sweats, vomiting, convulsions, insomnia, diarrhea, stomach issues, muscle cramps, anxiety, heart palpitations, mental fog, and loss of energy.

9.      Defendant Numbz LLC is a California limited liability company with its registered address located in Thousand Oaks, California.  Numbz, LLC markets sells and distributes the Products throughout the United States, including in California and Texas.  Numbz LLC manufactured, marketed, and sold the Products at issue at all times during the relevant Class Period.

**JURISDICTION AND VENUE**

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from one Defendant.

11.      This Court has personal jurisdiction over the parties because Defendant is registered and has its principal place of business in California.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant's registered address in this District, making Defendant at home in this District.

## FACTUAL ALLEGATIONS

### A.     Background and Pharmacology of Kratom and 7-Hydroxymitragynine

13.     "Kratom" refers to the substance derived from the leaves of a tropical plant, *mitragyna speciosa* (the "kratom plant"), indigenous to Southeast Asia, where it has been used in herbal medicine since the 19th Century.  Kratom's first reported use in scientific literature was in 1836, when it was noted that Malays used kratom tree leaves as a substitute for opium.  Historic use of the kratom plant was particularly well-documented in Thailand, Indonesia, and Malaysia, where kratom remains popular to this day.

14.     Kratom is the most widely used drug in Thailand.  This popularity does not mean Thailand believes kratom is harmless.  To the contrary, Thailand understands that kratom is dangerous, as demonstrated by its ban of the substance in 1943.[3]  Kratom was also historically popular in Malaysia until it was banned in 1952 under the Poisons Act.

15.     Kratom's variable effects have historically been part of its appeal.  For instance, the earliest accounts of kratom characterize kratom use for both a stimulant effect during hard day-labor by chewing fresh kratom leaves, and also for an analgesic or relaxing effect by brewing kratom into a tea.

16.     In the Western world, kratom is sold online and at herbal stores, gas stations, corner stores, smoke shops, and "head" shops where it is primarily marketed as an herbal medicine or natural supplement to use to "treat" a variety of ailments

---

[3] In 1943, Thailand banned the possession, use, and propagation of kratom, and later banned all kratom sales, imports, exports, and consumption all together.  However, in 2021, Thailand decriminalized possession of kratom in response to a growing pressure on its justice system to fix the country's overcrowded prisons through liberalization of its drug laws.

(e.g., pain, mental health, opioid withdrawal symptoms), and/or to obtain a "legal" or "natural" high.

17.  To create consumable kratom products, kratom plant leaves are harvested, dried, and crushed into a fine powder that is then packaged and sold in pouches, capsules, or liquid formulations.[4]

18.  The chemicals in the kratom plant, which produce a psychoactive effect when ingested, are called "alkaloids."  "Alkaloids" are a class of various naturally occurring organic chemical compounds.  The primary alkaloids in kratom leaves responsible for kratom's effects are mitragynine ("MG" or "MIT") and 7-Hydroxymitragynine ("7-OH").

19.  MG and 7-OH produce a wide spectrum of effects because they interact with many different receptors in the brain.  Studies show that MG and 7-OH interact with alpha-2 adrenergic receptors (adrenaline), D2 dopamine receptors, and the serotonin receptors (5-HT2A and 5-HT2C), all of which contribute to kratom's mood-lifting and stimulant-like effects.

20.  Defendant's Products are unique as compared to most other kratom products on the market and represent a "next-gen" iteration of the substance in terms of addictiveness and harm-potential.  They are an isolated and concentrated version of kratom, making 7-OH the primary active alkaloid and stripping the rest away.

21.  Compared with raw kratom, 7-OH typically only occurs in doses that are no greater than 2% of total alkaloid content (or 0.05% by weight).  However, this is not the case with Defendant's Products, in which 7-OH constitutes nearly 100% of the total alkaloid content.[5]

---

[4] When kratom leaves are extracted into a liquid formulation, it is colloquially called a kratom "extract shot."

[5] Numbz LLC, *Lab Results*, Eat Numbz (last visited Oct. 30, 2025) https://eatnumbz.com/lab-results/.

22.    7-OH is different than MG because, although both interact with the mu-opioid receptor,[6] MG has a dramatically lower affinity for the mu-opioid receptor, whereas 7-OH has an affinity for the mu-opioid receptor that is comparable to—or greater than—opioids like Percocet, morphine, and oxycontin.  Studies have shown that when 7-OH is administered in concentrated, isolated doses, it presents a significantly greater risk of inducing physical and mental addiction in consumers than raw kratom.  Yet, consumers are largely ignorant of this fact.

23.    For instance, while both 7-OH and MG target the opioid-receptors, 7-OH's effect on the opioid receptors is approximately forty-six times that of MG, and thirteen times that of morphine.[7]

24.    Opioids are addictive not only because of the pleasurable effects that they produce, but also because sudden cessation of opioid use causes severe withdrawal symptoms, which users feel compelled to avoid by taking more of the drug.  The tragedy of addiction is that users want to stop but cannot.

25.    All substances that act on the opioid receptors have a high risk of addiction, and 7-OH is no exception.  Addiction occurs when an opioid is ingested on a regular basis and, over time, the user develops a tolerance to the drug that requires the user to consume an increased dose of the drug to achieve the same effects a lower dose previously had.  As these doses increase, the body becomes dependent on the drug to feel normal and function properly.  When the drug is suddenly taken away or the user tries to stop taking the drug, withdrawal occurs.

---

[6] The mu-opioid receptor produces the most addictive or habit-forming effects, such as euphoria and analgesia.  For this reason, the mu-opioid receptor is known as "the gateway to addiction" because it is the receptor that all opioids interact with to produce the classic opioid high feelings of euphoria, sedation, and pain relief.

[7] *Kratom—Pharmacology, Clinical Implications, & Outlook: A Comprehensive Review*, National Library of Medicine, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7203303.

---

Withdrawal symptoms cause the user to feel much worse than they did before they started taking the drug and can be extremely painful and intolerable to the user.

26. Indeed, 7-OH withdrawal symptoms are very similar to those of traditional opioid withdrawal. These symptoms include irritability, anxiety, difficulty concentrating, depression, sleep disturbance including restless legs, tearing up, runny nose, muscle and bone pain, stomach pain, muscle spasms, diarrhea, decreased appetite, chills, inability to control temperature, extreme dysphoria, and malaise.

27. Users typically start substances like 7-OH because of how good it makes them feel, but once addicted, they use 7-OH to avoid the pain and sickness of withdrawal. Use is no longer about getting high, but about not feeling "sick."

**B.    Background and Pharmacology of Kratom and 7-Hydoxymitragynine**

28. Over the past decade, kratom has exploded in popularity within the United States. As of 2021, the American Kratom Association estimates that kratom is a $1.3 billion a year industry, with 11 million to 15 million annual users within the United States. Studies show that 1 million United States residents use kratom monthly, and that two-thirds of those users use kratom daily.

29. Kratom's popularity is attributed to several factors: first, kratom is marketed as a safe substitute for painkillers and so it appeals to consumers who falsely equate "natural" with "safe;" second, kratom has received media attention as a "nootropic" or "smart" drug because it is stimulating at low doses; third, kratom is widely available and unregulated within the United States; fourth, it produces a "pleasurable" high; and lastly, users are unaware of kratom's opioid-like characteristics, addiction, and withdrawal potential.

30. 7-OH is new to the market. Having only arrived in 2022 or even more recently.

31.    Kratom is still a relatively unknown substance to the average consumer, and most people have never heard of it.  This is doubly true of 7-OH.  Even if consumers have heard of kratom they may not have heard of 7-OH.

32.    7-OH sellers advertise it as a substitute for coffee or a kratom derivative of equal potency, a pain reliever, a treatment for opioid withdrawal, an antidepressant, an anti-anxiety supplement, and that it improves focus and gives users a boost of energy to get through the day.  Some even assure consumers that 7-OH is a non-addictive way to deal with opioid withdrawal.  These 7-OH companies universally reiterate these purported "benefits" of 7-OH consumption, without disclosing any of its corresponding harms.

33.    As a result of 7-OH manufacturers', retailers', and advertisers' failure to warn consumers of 7-OH's addictive potential, many 7-OH users find themselves blindsided when they stop taking 7-OH and find themselves facing severe withdrawal symptoms after having stopped using what they thought was a harmless supplement. Further, because 7-OH is relatively unknown in the United States, there are not well-established recovery resources for addicted users to turn to for resources and aid. Some 7-OH users turn to the Internet for support, and there are well-populated and very active Internet forum support groups for consumers struggling with, and recovering from, kratom addictions.

34.    The reports from people addicted to 7-OH are heart-wrenching. Consistent among these reports is a feeling of initial shock when users realized they had become unknowingly addicted to 7-OH, and how difficult it was to stop their 7-OH use.  Below are several accounts from the "Quitting Kratom" forum on www.reddit.com, which has over 47,000 members as of January 2025:[8]

> i.    In one post titled **Do no take 7oh**, a user wrote: I'm going to say this loud and clear for everyone in their early stages of quitting, currently, or have already quit. DO NOT take this 7oh

---

[8] *See* https://www.reddit.com/r/quittingkratom.

shit. It's fucking poison. It's nothing like the extracts and it's a very VERY taxing drug on the body. I have done every single thing under the sun and I can honestly say with confidence that this is by far bar none the absolute worst drug I've ever taken when it comes to detoxing.

ii.   In another post titled **Beware of 7-Hydroxymitragynine,** a user wrote**:** I ended up getting these extract pills that were 14mg of 7 Hydroxymitragynine per pill. Used them for about a week for some bad pain, and then got thrown into aggressive withdrawal. I've been on a now 3 month taper journey off of just a week of using them. It's been hell. Trying to get there slowly tapering. Just wanted to put the PSA out there, something like [7-OH] might be tempting, and it is incredible for pain, but it threw me into awful withdrawal that's now forced me to have to taper off of it and take a dose every 12 hours. This was after 2 and a half years of regular Kratom use that never gave me withdrawal. This week of using [7-OH] though mixed with my 2 and a half years of Kratom experience created a withdrawal shitstorm that was never expected. Beware.

a.   **Another user responded**: I don't know how you're cold turkey from [7-OH], I tried and it was worse than when I had to kick morphine. I've had to do a long and slow taper with 6grams of Kratom powder every 12 hours currently. The [7-OH] withdrawal is very scary, worse than any opiate I've been on.

b.   **Another User Responded**: I started taking those because the guy suggested them now it's every day for 3 months. I can't stop and get bad withdrawals at 24 hr mark. I'm taking about 6 a day now and I'm spending over 1K per month now it's going to ruin me if I don't stop. I can't believe this is legal, idk what to do

iii.  In separate post another user wrote: Guys I desperately need help. I have been taking [7-OH] for maybe 6 months. Like more than three a day. The more research I do on them the more I realize they're not even Kratom and no one scientifically really knows anything about them. I am going across the country tomorrow and am going to be CT for 8 days. I actually really

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    9

want to stop and I've been trying to for a really long time, but I am terrified of the withdrawals. I don't know what to do. I actually upped my dose this week and have probably been taking more like five a day. I am so embarrassed to say that, I am now realizing that everyone is cautioning even the fucking American Kratom Society about these things. I'm really worried about my mental health not to mention I am going to be with my wife/kids and parents for 8 days. I don't know what I was thinking. Any recommendations?

iv.  In another post titled **Could not and would not believe you all…**another user wrote: Long time lurker, first time poster. I went CT three days ago… after using for 1 1/2 years. The last 3 months I've been exclusively abusing the [7-OH] tablets, a full pack of three a day. I told myself you were all exaggerating. I told myself you were all weak.  Now I'm completely humbled and fully ashamed.  The last three days I've experienced a fatigue and fever like I've never experienced before. Trying to fall asleep and stay asleep, is absolutely impossible. During the night I sweat through my sheets…during the day I feel like a walking corpse.  And I caved.  I took half a tablet today just to stop the WD symptoms I was feeling. Now my brain just wants to rationalize what I've done. But I know, deep down this was the wrong move…I'm truly ashamed.  I share this post for the people like me, who are lurking or glancing at this subreddit from time to time and telling themselves "naw I'll be fine…I can handle the WD whenever I decide or if I ever stop." I share this post for future me to look at to read and see the seriousness of my addiction and situation. I know that next time I quit I need to be more prepared.  If you abuse it the way I do…Kratom is robbing you of life, and you trade it willingly for a 2 hour high. There's so much more to life than getting high.  Thank you to this community, I hope you all know how much reading your stories and struggles does for someone like me. Thank you 🙏🏻

35.  Other experiences with kratom (not necessarily 7-OH products) described on the subreddit are similarly horrifying:

One user wrote: I started using kratom in pill and powder form a couple years ago. I had no idea it was addictive, and I liked how it

made me feel.... so much that I went from using it a couple weekends a month to wanting to use it every weekend to wanting to use it every day. I upped my dose a whole bunch, and soon I started to realize that, when I didn't take it, I would start to get what seemed like withdrawals! WTF? I googled it and did some more research and learned that I was indeed going through withdrawals. I immediately decided to suck it up and get off that stuff and spend a week withdrawing. Unfortunately, it wasn't that simple. I was addicted. That poison was in my mind constantly. I started using again and, LONG story short and many MANY other withdrawal attempts later, I had lost my JOB, my boyfriend, and my personality. It landed me in the hospital many times actually. I was losing hair, my eyes looked horrible, my skin was horribly dry, and I was miserable. I decided to go to REHAB. Effing rehab for this sh!t.

**Another user shared:** I just tapered down from 80gpd to 20, and the experience was so awful that I just decided to jump yesterday, figuring "Let's just get this over with already!" Well, I gotta tell you, last night may have been one of the roughest nights of my life. It felt like a bad acid trip. I got zero sleep. The RLS was so bad I kept getting out of bed, bundling up, which was exhausting in itself, and going for a loop around the property outside; while hoping to be able to crawl back in bed and actually sleep. Nope. It felt like I was being electrocuted!!! This is even with clonidine and gabapentin. But, I'm determined to NEVER go through that first night again! (And of course I was lamenting my rash decision to jump, and DYING to take some K). But, there's no turning back now. I'm hoping I'll get some sleep tonight since I had none last night. Wish me luck please :).

**Another user shared:** I was the worst kratom addict I knew and now I'm coming up on 5 months sober. Let me first qualify VERY quickly…  Multiple extract shots a day, crying on the way to the store, cut up all my credit cards multiple times (until I got Apple Pay), sent my credit cards to myself in the mail, got on oral naltrexone, got on vivitrol (the injectable shot), gave my wife my wallet, lied every day, ... Today I'm sober off of everything and almost 5 months clean. I don't crave alcohol or drugs anymore. Cravings were my biggest problem. I don't

think about kratom all day any longer. I had to walk my sad @$$ all the way to a 12 step program in order to get help. I have to talk to other struggling people. I had to start working a program of recovery which i still work…My habit was $50 a day, and with a newborn and mortgage etc I'm still trying to climb out of that hole. But man, to go from complete self-hate to self-love makes everything worth it. I hated myself, not anymore.

36.    This Internet forum is filled with other accounts like these, and the stories are consistently the same: well-meaning people were looking to feel better by taking what they thought was an "herbal supplement," only to develop an opioid-like addiction.  This anecdotal evidence makes clear that 7-OH's addictive potential is a material fact to reasonable consumers that, if known, would help inform their purchase and consumption decisions.  However, Defendant's Products fail to conspicuously warn that 7-OH is similar to an opioid, is habit-forming, or that regular use will result in opioid-like dependency and withdrawal symptoms.

37.    Consumers who knew the truth about 7-OH would not have purchased the Products.

C.    **Defendant Knew or Should Have Known They Were Selling a Highly Addictive Drug to Unsuspecting Consumers**

38.    Defendant manufactures the Products in a highly specialized lab and utilizes highly technical knowledge about kratom and its alkaloids to synthesize the Products.  Thus, Defendant is acutely aware of the addiction risks posed by the Products.

39.    Despite this knowledge, Defendant failed to conspicuously disclose 7-OH's addictive potential to customers on the Products' packaging.

40.    Defendant has no excuse for its lack of a prominent disclaimer warning of 7-OH's harms on the Products' packaging.  The pharmacological effects of 7-OH have been studied, and it is well-established that 7-OH acts on the same mu-opioid

receptors in the brain as traditional opioids do.  Further, there are widespread reports and studies of other addiction and dependency issues.

41.     Defendant therefore knew or should have known that kratom and kratom-derivative users can develop an addiction.  Yet, Defendant fails to clearly disclose this material fact in its advertisements or on the Products' packaging.

42.     The very fact that Defendant possesses the capability to manufacture the Products shows that it understands the pharmacokinetic nature of 7-OH and the substantial risk of addiction that it poses to consumers.  Despite this, Defendant markets the Products as if they are nothing more than over-the-counter supplements.  Indeed, the packaging looks more like a sports vitamin than a dangerously strong opioid, and Defendant's glossy website and design language obfuscate the very truth that it is selling a strong narcotic to consumers who likely do not fully comprehend the risks associated with consuming the Products.

43.     For example, flavors like "Strawberry Dragonfruit" gives the Products a fun and playful feel, reminiscent of a sport's vitamin, not a dangerous opioid.  *Compare* figures below.  Defendant even named its Products in a similar way.

 

***Figure 1: Compare Numbz 7-OH Tablet with Nuun Sport Hydration Tablet***

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    13

1    44.    Moreover, the Products' description also does not help matters.  In the

2    picture below, taken from Defendant's website, Defendant states that "Numbz

3    Kratom offers a range of natural effects, including enhanced focus, calm relaxation,

4    and a gentle energy lift."  *See* Figure 2.  This description does not inform potential

5    consumers of the Products' risks and is akin to descriptions used for commonly safe

6    vitamins and other supplements.

7

8

9

10

11

12

13

14

15    *Figure 2: Product Description from Defendant's Website*

16    45.    Additionally, under the "Product Ingredients," Defendant states that the

17    Products are "Rooted In Nature," once again implying that they are safe to consume.

18    *See* Figure 3.

19

20

21

22

23

24

25    *Figure 3: Product Ingredients from Defendant's Website*

26    46.    For the reasons described above, consumers (like Plaintiff) will walk

27    into a local headshop or visit Defendant's website, see the Products, and be enticed

28



**PRODUCT DESCRIPTION**

This blend captures the perfect balance of delicate coolness and invigorating vibrancy, delivering a flavor that is both soothing and energizing.



**PRODUCT INGREDIENTS**

- 7-HYDROXYMITRAGYNINE (7-OH)
- 50MG TOTAL PER PRODUCT
- 25MG PER TABLET / 2 TABLETS TOTAL
- Natural Energy Boost
- Rooted In Nature
- Lab Tested

Natural binders & fillers, (microcrystalline-taglinemicro cellulose, magnesium stearate, silica oxide, di-calcium phosphate)

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    14

into purchasing them because they think they look inviting and if they were dangerous, there would be a clearly stated warning on the package.

47. Aside from people well versed in street-level drug activities, reasonable consumers looking at the Products' packaging and online store description would not presume that 7-OH is highly addictive.

48. As a 7-OH product seller, manufacturer, and/or distributor, Defendant occupies a position of superior knowledge to the average reasonable consumer, who likely knows nothing about 7-OH. On Defendant's website homepage, it markets the Products as the following:

> "What is 7-OH? 7-OH (short for 7-hydroxymitragynine) is one of the most powerful natural compounds found in the Kratom plant. It's what gives Kratom its strong, fast-acting effects — like relief, calm, or a lift in mood. It's more potent than regular Kratom leaf, which means you can feel more with less."

49. Also on Defendant's homepage, under the "Frequently Asked Questions," it states:

> "Numbz Kratom offers a range of natural effects, including enhanced focus, calm relaxation, and a gentle energy lift. Effects vary by individual and dosage, so start slow and find your perfect balance."

> "Numbz is a premium line of Kratom extract for a not-so-premium price… designed for smooth, consistent effects and refined flavors. We focus on purity, potency, and an elevated experience, ensuring every dose meets the highest quality standards."

50. In these descriptions, Defendant touts all the potential benefits of the Products but fails to disclose on the Products' packaging the heightened harm and additional risk of addiction that corresponds with the increased potency of the Products.

1    51.    Moreover, although Defendant includes a disclaimer on the label of the

2    Products, it is printed in an extremely small, inconspicuous font that was impossible

3    for Plaintiff and similarly situated consumers to see.  *See* figure 4 below.  Because

4    the product does not appear unsafe based on its packaging, marketing, and flavoring,

5    a reasonable consumer would not be inclined to spend time reading the small,

6    seemingly insignificant disclaimer.



***Figure 4: Defendant's Tiny Disclaimer on the Back of Defendant's Bottles***

52.    Addiction is a disease.  As such, Defendant's Products pose an

unreasonable health hazard, and Defendant had and has a duty to disclose this fact

***conspicuously on the Products' labeling and packaging.***

53.     What's more, nothing about the Products' packaging would lead reasonable consumers to believe they were purchasing compounds similar to opioids, that function on the same mu-opioid receptors in the brain.  They look as innocuous as a vitamin supplement.

54.     Defendant, through its misleading advertising and failure to clearly, conspicuously disclose 7-OH's addictive properties on the Products' labels, relied upon the average consumer's incomplete knowledge of 7-OH to better sell the Products and get users addicted to them.

55.     With respect to the Defendant's website, there is not a single warning provided.  Even in the product images, the disclaimer or warning is absent.  Consequently, consumers who purchase the product online have no way of knowing this at the time of purchase.

56.     Defendant fails to clearly disclose 7-OH's addictive potential because Defendant knows that it is a material fact to reasonable consumers that would influence their purchasing and consumption decisions, likely to Defendant's financial detriment.

57.     By any metric, Defendant's conduct is immoral, unethical, and contrary to public policy.

58.     The United States is currently experiencing an opiate crisis that is shaking the foundations of our society.  Amid this crisis, Defendant is creating more addicts for no reason other than to line its pockets.  That cannot—and should not—stand, at least when Defendant's conduct entails fraud and violation of state consumer protection statutes, as it does here.

59.     Accordingly, because the facts concern a critical safety-related deficiency in the Products, Defendant was under a continuous duty to disclose to Plaintiff and the members of the Classes the true standard, quality, and grade of the Products and to prominently disclose that the Products are—or potentially are—addictive.  Defendant also had a duty to disclose because of its exclusive and/or

superior knowledge concerning the true nature and composition of the Products as the owner, manufacturer, producer, marketer, and seller of the Products. Nonetheless, Defendant concealed this material information.

## CLASS ALLEGATIONS

60.    ***Class Definition***.  Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of himself and all other similarly situated consumers, and seeks to represent a class (the "**Class**") defined as:

> All persons in the United States who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, purchased Numbz 7-OH Kratom Tea Leaf Tablets.

61.    Plaintiff also seeks to represent a subclass of all Class members who purchased Defendant's Products in Texas, within the applicable statutory period (the "**Texas Subclass,**" collectively, together with the **Class**, the "**Classes**").

62.    Specifically excluded from the Classes are Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.

63.    Plaintiff reserves the right to amend the definition of the Classes if discovery or further investigation reveals that the Classes should be expanded or otherwise modified.

64.    ***Numerosity.***  Members of the Classes are so numerous that their individual joinder herein is impracticable.  On information and belief, the Classes comprise of at least thousands of consumers throughout Texas and the United States. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified

of the pendency of this action by mail and/or publication through the distribution records of Defendant.

65. ***Commonality and Predominance***.  Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

    (a) whether Defendant's marketing scheme has the capacity to mislead reasonable consumers;

    (b) whether Defendant knew that kratom is a highly addictive substance;

    (c) whether Defendant had a duty to inform consumers about the risks inherent to consumption of the Products;

    (d) whether Defendant's conduct alleged herein violated Texas's Deceptive Trade Practices Act, Tex. Bus. & Com. Code § 17.41, et seq.;

    (e) whether Defendant's conduct alleged herein constitutes unjust enrichment;

    (f) whether Defendant's conduct constitutes fraudulent omission;

    (g) whether Plaintiff and the Class are entitled to damages and/or restitution; and

    (h) whether Plaintiff and the Class are entitled to attorneys' fees and costs.

66. ***Typicality.***  Plaintiff's claims are typical of the claims of the Class in that Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's failure to adequately inform Plaintiff and all others similarly situated that its Products are highly addictive and operate similarly to opioids.

67. ***Adequacy***.  Plaintiff will fairly and adequately protect Class members' interests.  Plaintiff has no interests antagonistic to Class members' interests, and

Plaintiff has retained counsel that has considerable experience and success in prosecuting complex class-actions and consumer-protection cases.

68.    ***Superiority***.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for members of the Class; the Class is readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

69.    Defendant has acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

70.    Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiff and members of the Class and will likely retain the benefits of their wrongdoing.

71.    Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

## COUNT I
### Violation of the Texas Deceptive Trade Practices-Consumer Protection Act ("Texas TPCPA"), Tex. Bus. & Com. Code §§ 17.41, *et seq.*

72.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

73.    Plaintiff brings this claim individually and on behalf of the Texas Subclass against Defendant.

74.    Plaintiff and the Class are individuals, partnerships, or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), *see* Tex. Bus. & Com. Code § 17.41, and are therefore "consumers," as defined by Tex. Bus. & Com. Code § 17.45(4).

75.     Defendant is a "person" as defined by Tex. Bus. & Com. Code § 17.45(3), which includes "partnership, corporation, association, or other group, however organized."

76.     Defendant engages in "trade" or "commerce" as defined by Tex. Bus. & Com. Code § 17.45(6), which includes "advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of Texas."

77.     The Texas Trade Practices-Consumer Protection Act ("Texas TPCPA") "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection." Tex. Bus. & Com. Code § 17.44(a).

78.     Tex. Bus. & Com. Code § 17.46(a)(5) prohibits "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not."

79.     Tex. Bus. & Com. Code § 17.46(a)(7) prohibits "representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

80.     Tex. Bus. & Com. Code § 17.46(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

81.     Defendant violated Texas Civil. Code §§ 17.46(a)(5), (a)(7), and (a)(9) by intentionally and misleadingly failing to clearly disclose that the Products are addictive, a fact which is material to reasonable consumers such as Plaintiff and the Texas Subclass members.

82.    Defendant's omissions deceive and have a tendency and ability to deceive the general public.

83.    Defendants have exclusive or superior knowledge of kratom's addictive nature, which was not known to Plaintiff or the California Subclass members.

84.    Plaintiff and Texas Subclass members have suffered harm as a result of these violations of the Texas Trade Practices-Consumer Protection Act ("TPCPA") because they have incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid had they known that kratom is addictive and causes withdrawals.  As a result, Plaintiff and the Texas Class are entitled to actual damages in an amount to be proven at trial, reasonable attorneys' fees and costs, declaratory relief, and punitive damages.

85.    In compliance with the provisions of Section 17.505 of the Texas Business & Commerce Code, Plaintiff sent written notice to Defendants on October 21, 2025, informing Defendant of his intention to seek damages under Tex. Bus. & Com. Code § 17.46.  The letter was sent via certified mail, return receipt requested, advising Defendant that it is in violation of the TPCPA and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom.  Defendant refused receipt of the demand letter.  Plaintiff has attempted to exhaust administrative remedies, but Defendant has refused to cooperate.

<u>**COUNT II**</u>
**Unjust Enrichment**

86.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

87.    Plaintiff brings this claim individually and on behalf of the Classes against Defendant.

88.     Plaintiff and the members of the Classes conferred a benefit on Defendant in the form of the gross revenues Defendant derived from the money they paid to Defendant.

89.     Defendant had an appreciation or knowledge of the benefit conferred by Plaintiff and the members of the Classes.

90.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff and the Class members' purchases of the Products, which retention of such revenues under these circumstances is unjust and inequitable because Defendant did not provide a clear warning that the Products were addictive and similar to opioids.  This caused injuries to Plaintiff and members of the Classes because they would not have purchased the Products or would have paid less for them if the true facts concerning the Products had been known.

91.     Defendant accepted and retained the benefit in the amount of the gross revenues it derived from sales of the Products to Plaintiff and the members of the Classes.

92.     Defendant has thereby profited by retaining the benefit under circumstances which would make it unjust for Defendant to retain the benefit.

93.     Plaintiff and the members of the Classes are, therefore, entitled to restitution in the form of the revenues derived from Defendant's sale of the Products.

94.     As a direct and proximate result of Defendant's actions, Plaintiff and the members of the Classes have suffered in an amount to be proven at trial.

95.     Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from his purchase of the Products is determined to be an amount less than the premium price of the Products. Without compensation for the full premium price of the Products, Plaintiff would be left without the parity in purchasing power to which he is entitled.

96.     Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price will ensure

that Plaintiff is in the same place he would have been in had Defendant's wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at his disposal.

## COUNT III
### Fraud by Omission

97.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

98.    Plaintiff brings this claim individually and on behalf of the Classes against Defendant.

99.    Defendant distributed the Products throughout the United States, including the State of Texas.

100.    Defendant misrepresented that its Products have attributes or qualities that they do not have by failing to conspicuously disclose that kratom is addictive and can cause opioid-like withdrawal.

101.    Defendant knows that kratom is addictive because it interacts with kratom vendors, has been made aware of user reports, and have fully characterized kratom's alkaloids and created advanced extraction methods.

102.    Defendant knows that knowledge of kratom's addictive nature is a material fact that would influence the purchasing decision of reasonable consumers.

103.    The average reasonable consumer in the kratom purchasing context does not know that kratom is addictive and cannot reasonably access that information.

104.    Defendant therefore had a duty to Plaintiff and the members of the Classes to conspicuously disclose that kratom is addictive and can cause withdrawals on the Products' packaging.

105.    Consumers reasonably and justifiably relied on Defendant's omission, as it is reasonable to expect that a product with addictive properties, such as an opioid, would include a clear and prominent warning.

106.    As a result of Defendant's omission, Plaintiff and the members of the Classes paid for kratom Products they may not have purchased, or paid more for those Products than they would have had they known the truth about kratom.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Louis Cuneo, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.    For an order certifying the Classes and naming Plaintiff as representative of the Classes and Plaintiff's attorneys as Class Counsel to represent the Classes;

b.    For an order declaring Defendant's conduct violates the statutes referenced herein;

c.    For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

d.    For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

e.    For prejudgment interest on all amounts awarded;

f.    For an order of restitution and all other forms of equitable monetary relief;

g.    For injunctive relief as pleaded or as the Court may deem proper; and

h.    For an order awarding Plaintiff and the Classes their reasonable attorneys' fees, expenses, and costs of suit.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated:  November 17, 2025

**BURSOR & FISHER, P.A**.

By:   _/s/ Ryan B. Martin_
           Ryan B. Martin

Neal J. Deckant (State Bar No. 322946)
Luke Sironski-White (State Bar No. 348441)
Ryan B. Martin (State Bar No. 359876)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ndeckant@bursor.com
            lsironski@bursor.com
            rmartin@bursor.com

*Attorneys for Plaintiff*